**Lloyd W. MEYER, Appellant,**

v.

**LeRoy L. NOTTGER, d/b/a Nottger Funeral Home, Appellee.**

**No. 2–57195.**

Supreme Court of Iowa.

May 19, 1976.

Johnson, Burnquist, Erb, Latham & Gibb, Fort Dodge, for appellant.

Beecher, Beecher, Holmes & Rathert, and Edward J. Gallagher, Jr., Waterloo, for appellee.

Heard by MOORE, C. J., and MASON, REES, UHLENHOPP and REYNOLDSON, JJ.

REES, Justice.

Plaintiff appeals from trial court's order sustaining defendant's motion for summary judgment, dismissing plaintiff's petition and entering judgment for defendant. We reverse and remand for further proceedings.

At the time of commencement of the instant action plaintiff Lloyd W. Meyer [hereafter Meyer] was a resident of Eagle Grove. Defendant LeRoy Nottger [hereinafter Nottger] operated the Nottger Funeral Home in Cedar Falls. The action arose out of the performance by Nottger of funeral services following the death of Meyer's father.

The original petition was filed May 3, 1972, and was subsequently amended by permission of the court. Nottger filed answer and, in February 1974, moved for summary judgment. Hearing on the motion was had February 26. On March 1, trial court sustained Nottger's motion and dismissed Meyer's petition.

The amended and substituted petition was in two divisions. In the first division, Meyer sought recovery in the amount of $50,000 compensatory damages and $30,000 exemplary damages for claimed tortious conduct on the part of Nottger. In the second division, Meyer sought to recover the same amount upon a theory that Nottger breached a contract for the performance of professional services. In each division Meyer alleged he had suffered severe emotional distress, mental anquish and disturbance of mental and emotional tranquility, along with a resulting heart attack, because of Nottger's conduct.

At the time of the ruling upon Nottger's motion for summary judgment, the record before trial court included depositions taken

of Meyer, his wife, Nottger, Waldo Jungkunz (Nottger's employee) and Dr. Herbert Gude, M.D., who rendered medical treatment to Meyer. Various interrogatories were also before the court. Trial court concluded in its order that the materials before it contained substantially all the evidence which would be admissible in a trial of the case.

The posture of this appeal requires that we view the facts in the light most favorable to plaintiff, the motion for summary judgment having been filed by defendant. See *Swets v. Pruisner,* 236 N.W.2d 299, 304 (Iowa 1975). So viewing the materials before the court, and resolving factual disputes in that manner, we may accept the following facts as established for purposes of this appeal.

Louis Meyer, plaintiff's father, was killed in an automobile accident on Thursday, May 7, 1970. Also killed in the accident was the elder Meyer's second wife [plaintiff's stepmother]. That evening Mrs. Jones, the daughter of the deceased Mrs. Meyer, contacted defendant Nottger by telephone and instructed him to bring both bodies to his establishment in Cedar Falls in order to make funeral arrangements. This was done.

Plaintiff Lloyd Meyer received word of his father's death Thursday evening. A call for Meyer's wife to Mrs. Jones confirmed that both bodies were at the Nottger Funeral Home.

Mr. and Mrs. Meyer and their son Donald drove to Cedar Falls Friday morning, at which time they met Nottger. Upon discovering Mrs. Jones had been at the funeral home and had wished to be informed of Meyer's arrival, Meyer took Nottger aside for the purpose of explaining that he wished the arrangements for his father's funeral to be separate from those for his father's second wife. At some point during conversations, Nottger represented that Meyer had no choice in the burial arrangements because his father's wife had survived his father in the accident. In fact, Nottger did not know which of the decedents had died first, and had assumed they

were killed simultaneously. Finally the parties agreed to a double funeral with separate burials. The bodys of Meyer's father was to be interred in Iowa Falls.

Meyer was informed that Mrs. Jones had already selected a casket for her mother, and that all he had to do, with respect to a casket for his father's body, was to concur in this choice. Nottger told Meyer that, in any event, he would have to select a sealer casket because the embalming fluid used on his father's body was a very strong formaldehyde solution which produced a harsh and unpleasant odor. Meyer did choose a sealer casket identical to the one chosen by Mrs. Jones. In his later deposition Meyer stated there was nothing wrong with the casket and it was "very handsome," but that he objected to the fact he had no choice but to select that particular model. He agreed to the model because it was "the harmonious thing to do."

During their discussions with Nottger that Friday, Mr. and Mrs. Meyer suggested that a Mr. Anderson, an Iowa Falls mortician and long-time friend of the Meyer family, could assist with the burial ceremony. Nottger assured them there would be no problem in this regard and asserted he knew Anderson well, that he had started Anderson in the funeral directing business. In fact, Nottger knew Anderson only "very casually." Nonetheless, Nottger called Anderson in the presence of Mr. and Mrs. Meyer and apparently discussed some details of the planned burial. Nottger assured the Meyers he [Nottger] would personally go to Iowa Falls to assist with the burial.

Meyer insisted there be a procession from the burial home to the gravesite, in which procession he would directly follow the hearse in his car. Nottger said there would be no problem in Meyer's following the hearse. Nottger also agreed that Meyer would select the pallbearers for the funeral and burial.

At some time that Friday, Meyer explained to Nottger it was important he be able to see his father's body, if only to confirm his father was actually dead.

Nottger advised him, "in a rather fatherly way," that he shouldn't view the body because of the offensive odor and because the body would not look like his father due to the injuries the elder Meyer had sustained. Mrs. Meyer then demanded to see the body. She expressed the belief Nottger could not legally prevent her from doing this. Although he acknowledged that might be true, Nottger was firm in his refusal to allow Mrs. Meyer to view the body, telling her that in six months she might be able to stand to hear how bad the body really was. The Meyers left the funeral home Friday without seeing the body.

The next day the Meyers went to the scene of the automobile accident near Nevada, Iowa. While there, they spoke with the highway patrolman who had removed the body of Meyer's father from the wreckage. The patrolman told them the elder Meyer had died of respiratory failure and there were no marks on his face from the accident. After discovering this, Mrs. Meyer called her attorney to explain the family's desire to see the body and Nottger's refusal to allow it.

The Meyers returned to the funeral home Saturday afternoon, confident they would be able to see the body. Nottger apparently continued his resistance to opening the casket, but acquiesced in the matter after receiving a call from the Meyers' attorney. At some point during that day, Nottger informed Mrs. Meyer he would not be responsible for her mental health in six months if she viewed the body. About four o'clock Saturday afternoon Mrs. Meyer and two of her sons finally saw the body, and they reported to Meyer that it was all right. As Meyer prepared to see the body himself, Nottger warned him that whatever he did, he should not touch his father's nose, as it had been reconstructed.

After seeing the body, the Meyers felt a sealer casket would have been unnecessary. The body was in a good enough condition to permit the opening of the casket [though the Meyers decided not to do this at the funeral] and there were no abnormal odors.

The funeral was the following Monday. According to Meyer, the service itself was "all right." Immediately after the service, however, one of the pallbearers informed the Meyers that he and the other pallbearers had been dismissed by Nottger, told they would not be needed at the burial site. The dismissal was contrary to the Meyers' wishes and was apparently rectified after the family spoke with Nottger.

The Meyers were taken to their car to await the departure of the funeral hearse. It was discovered that Jerry, one of the Meyers' sons, had left his raincoat at the house of his deceased grandfather. In addition, the Meyers were concerned that a number of persons planning to prepare a luncheon at the house would not be able to get inside. A decision was made to make a quick trip to the house to take care of these matters, and to this end Mrs. Meyer told Nottger not to do anything further until they returned. Nottger replied that was fine and "there was no hurry to get to Iowa Falls."

When the Meyers returned to the church 12–15 minutes later, no one was there. While they had been away, Waldo Jungkunz, Nottger's assistant, had started with the hearse toward the gravesite in Iowa Falls. Jungkunz stated in his deposition he did not know he was supposed to wait for the Meyer family to return. Upon finding everyone gone from the church, the Meyers "panicked." With their son driving their car they found Highway 20 and headed west toward Iowa Falls in an effort to overtake what they assumed to be the "procession." East of Parkersburg the highway patrol stopped their auto for violation of the speed limit. The officer who detained them issued a traffic ticket to the son and refused to escort them to the procession.

While the car was stopped, Meyer became ill. According to his deposition, he was thinking of what he characterized as the "endless chain of happenings, of mistakes" and "ugly things" in connection with the funeral when be became nauseous and experienced a heavy pressure-type pain in the chest and difficulty in breathing. After

leaving the patrolman, the Meyers proceeded on to the cemetery, where the mourners were already gathered for the burial. Meyer, however, was taken immediately to a physician and subsequently hospitalized. The burial was postponed.

The deposition of Dr. Herbert Gude indicates Meyer was struck by acute myocardio ischemia, that is, a spasm of a heart artery which temporarily cuts off a portion of the heart's blood supply. A week after this "heart attack," Meyer was taken by ambulance to the cemetery to view his father's burial, then transferred to a Fort Dodge hospital for convalescence.

Dr. Gude stated in his deposition that stress and emotional trauma can cause the type of attack experienced by Meyer. In response to a hypothetical question in which he was asked to assume the truth of the facts asserted by Meyer, Dr. Gude expressed the opinion that upon those facts, the events surrounding the funeral and arrangements therefor constituted a "deciding factor" in causing Meyer's attack.

An examination of the entire record discloses a number of factual disputes. Trial court acknowledged the presence of factual issues, but considered them immaterial. The court ruled summary judgment was appropriate because, "[I]f plaintiff at trial were to establish in the proof all of the facts and reasonable inferences therefrom contained in his deposition and other materials presented to the court, there would still not be a submissible issue to present to the jury."

In general the court held:

(1) There were no actionable consequences to a number of the allegations set forth in Meyer's petition;

(2) There was insufficient factual basis to permit a trier of fact to determine the action of Nottger's driver in driving the hearse from the site of the funeral in Cedar Falls toward the cemetery in Iowa Falls was done with any willful or wrongful intention or any illegality, spite, hatred or ill will;

(3) Compensatory damages for emotional distress unaccompanied by trauma will not be allowed in the absence of a showing the acts of defendant in causing such stress were performed with such intentional, willful, or malicious frame of mind as would provide, in other instances, a basis for the award of exemplary damages;

(4) The Supreme Court of Iowa would not, under these facts, authorize an action for the recovery of damages for emotional stress or mental anguish, absent trauma, arising out of the breach of a contract to perform funeral services.

Meyer states five issues for review, two of which may be combined with interrelated issues to yield the following questions for our consideration:

(1) Did trial court err in ruling no genuine issue of material fact existed with respect to compensatory damages pursuant to Division I of Meyer's petition?

(2) Did trial court err in ruling no genuine issue of material fact existed with respect to compensatory damages pursuant to Division II of Meyer's petition?

(3) Did trial court err in ruling no genuine issue of material fact existed with respect to Meyer's claim for recovery of exemplary damages?

The general standards applicable to this appeal are clear. In numerous cases this court has discussed the principles governing its review of whether a trial court properly sustained a litigant's motion for summary judgment. See, e. g., *Swets Motor Sales, Inc. v. Pruisner, supra,* 236 N.W.2d 299 (Iowa 1975); *Carter v. Jernigan,* 227 N.W.2d 131 (Iowa 1975); *Daboll v. Hoden,* 222 N.W.2d 727 (Iowa 1974); *Davis v. Comito,* 204 N.W.2d 607 (Iowa 1973); *Sherwood v. Nissen,* 179 N.W.2d 336 (Iowa 1970).

A motion for summary judgment may be sustained only where the moving party demonstrates the absence of any genuine issue of material fact. Rule 237(c), Rules of Civil Procedure; *Swets, supra,* 236 N.W.2d at 303. As we observed in *Daboll, supra,* 222 N.W.2d at 731:

"The purpose of the rule is to avoid useless trials. Where there is no genuine

issue of fact to be decided, the party with a just cause should be able to obtain a judgment promptly and without the expense and delay of a trial. [citations] 'In ruling on a motion for summary judgment, the court's function is to determine whether such a genuine issue exists, not to decide the merits of one which does.' [citation]."

In order to rule upon such motion, the trial court must examine the entire record before it, including the pleadings, admissions, depositions, answers to interrogatories and affidavits, if any. *Davis, supra,* 204 N.W.2d at 611. As is noted above, the burden to show the absence of any genuine issue of material fact is upon the moving party, and the materials before the court are viewed in the light most favorable to the opposing party. *Swets, supra,* 236 N.W.2d at 304; *Carter, supra,* 227 N.W.2d at 132.

■ In *Sherwood, supra,* 179 N.W.2d at 339, we commented upon the method by which a trial court is to ascertain whether a genuine material fact issue exists. We remarked that the motion for summary judgment is similar in theory to the motion for directed verdict. If, upon the basis of such material before the court as would be competent proof at trial, the court would be compelled to direct a verdict for the movant, then it is proper to render summary judgment.

Guided by the above standards, we proceed to the specific questions posed by this appeal.

### I. *Division I of the Petition.*

In Division I of his amended and substituted petition, Meyer sought recovery upon the theory that Nottger's conduct in connection with the funeral and arrangements therefor was "intentional, wrongful, outrageous, reckless and malicious and done with the intention of causing Plaintiff severe emotional distress and resulting physical injury, or so acted when * * * [Nottger] * * * knew or should have known that his conduct would cause, or be likely to cause, severe emotional distress and resulting physical injury."

Paragraphs five through eight allege the facts upon which Meyer bases his claim for recovery in Division I of the petition. In these, Meyer asserts:

"5. That Defendant advised Plaintiff and his family that the deceased's wife had died subsequent to the deceased, said statement being untrue, and was intended and did induce Plaintiff to retain only the Defendant to undertake the services and duties incident to the funeral and burial.

"6. That Defendant advised Plaintiff that a more expensive sealer casket had to be purchased due to the objectionable odor of the deceased, when, in fact, there was no objectionable odor and a sealer casket was not necessary.

"7. That Defendant advised Plaintiff that he and his family could not view the body of the deceased because of the gruesome condition and noxious odor of the body, when, in fact, the body was not in such gruesome condition, nor did it have such noxious odor.

"8. That Plaintiff was delayed in joining the procession to the cemetery and Defendant was advised to delay the procession until Plaintiff was present. The Defendant did not comply, causing the procession to proceed without Plaintiff's presence and resulting in Plaintiff's inability to view the interment on that date."

Trial court held there were no consequences to the allegations made in paragraphs five, six and seven by way of injury or damage. It further held that paragraph eight and supporting evidence raised no issue for the trier of fact because there was no evidence from which it could be inferred the action alleged was done with any willful or wrongful intention or with any illegality, spite, hatred or ill will.

■ We believe trial court erred in its finding and conclusion there were no genuine issues of material fact in the record.

It would be of little benefit to trace in this opinion the development of the law in our jurisdiction regarding recovery for in-

fliction of severe emotional distress in the absence of other physical injury or another independent tort. For such a discussion see note, 23 Drake L.Rev. 210 (1973).

■ Both parties to this appeal appear to be in agreement that the instant issue is properly resolved by reference to the standards adopted by this court in *Amsden v. Grinnell Mutual Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972). We there held the following elements necessary to the presentation of a prima facie case for the tort of intentional infliction of severe emotional distress:

(1) Outrageous conduct by the defendant;

(2) The defendant's intention of causing, or reckless disregard of the probability of causing, emotional distress;

(3) The plaintiff's suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

■ Where a plaintiff demonstrates the existence of the above elements, he can recover for physical injuries or illness resulting from the severe emotional distress, as well as for the distress itself. Long ago this court recognized that injuries to the nervous system can affect the health of the body as a whole. See *Watson v. Dilts*, 116 Iowa 249, 252, 89 N.W. 1068, 1069.

■ The third and fourth elements above involve familiar tort principles and require little discussion. "Outrageous" conduct may broadly be defined as "conduct exceeding all bounds usually tolerated by decent society." See *Amsden, supra*; compare Restatement (Second) of Torts § 46, Comment d at p. 73 (1965). The requirement that the conduct be "outrageous" can be understood by reference to the policies underlying the action.

On the one hand, few would suggest the courts should open wide the door to fictitious claims and to the resolution of trivialities or mere bad manners. See Prosser, Law of Torts § 12, p. 51 (4th ed. 1971). The tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra*. "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, 1035 (1936).

On the other hand, where conduct exceeds that which a reasonable person could be expected to endure and serious emotional injury results, there clearly exists an interest in allowing recovery, both to compensate the victim and to delineate the boundaries of permissible activity.

■ The second element of the action defined in *Amsden* requires the defendant's intention of causing, or reckless disregard of the probability of causing, emotional distress. We subscribe to the position of the Restatement (Second) with regard to this element. See Restatement (Second) of Torts § 46, *supra*, comment i at 77. Thus, the rule applies where the actor desires to inflict severe emotional distress, and also where he knows such distress is certain, or substantially certain, to result from his conduct. It applies also where defendant acts recklessly, as the term is defined in Restatement (Second) of Torts § 500, in deliberate disregard of a high degree of probability that emotional distress will follow. Section 500 provides:

"The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is

substantially greater than that which is necessary to make his conduct negligent." As applied to the type of action with which we are concerned, the above standard would refer to an unreasonable risk of severe emotional distress rather than only to physical harm.

Trial court ruled as a matter of law that Division I of Meyer's petition and the supporting materials therefor raised no triable issue of fact. We disagree. We have examined the materials before the court in the light most favorable to Meyer, granting him all reasonable inferences therefrom, and we believe that, so viewed, there is sufficient evidence from which a reasonable trier of fact could conclude all elements of the *Amsden* definition have been satisfied.

The materials before the court clearly raised factual issues with respect to Division I of Meyer's petition. Trial court apparently recognized this. Because we believe these fact issues to be material, we are obliged to hold trial court erred in sustaining Nottger's motion for summary judgment insofar as it related to the petition's first division. Accordingly, trial court must be reversed.

## II. *Division II of the Petition.*

In Division II of his petition, Meyer sought $50,000 compensatory damages and $30,000 exemplary damages as a result of Nottger's alleged breach of contract to perform funeral services according to acceptable standards. Paragraph 10 incorporates Meyer's allegations in this regard. According to that paragraph, Nottger, personally and through his agents and servants, breached a contract to perform professional services through one or more of the following acts:

(a) The Defendant advised Plaintiff that he would contact and engage for assistance a mortician at the place of burial, said mortician being a long-time friend of Plaintiff's family, and further stated that he had started said mortician in business, trained him in the trade; that said Defendant did not know said mortician and did not contact him;

(b) Defendant stated that the deceased's wife had died subsequent to the deceased, there being no basis for this statement;

(c) The defendant stated that the noxious odors were or would be emanating from the deceased's body; this was known by the Defendant not to be the case;

(d) Defendant induced the Plaintiff to purchase an expensive sealer casket to contain said odors, when in fact, there was no objectionable odor and a sealer casket was not necessary;

(e) The Defendant described in great and gruesome detail the mutilated condition of the body, when, in fact, the body was not in such a condition;

(f) Defendant advised Plaintiff that he and his family could not view the body because of its mutilated condition, when, in fact, the body was not in such condition;

(g) When advised the Plaintiff would be delayed in joining the procession to the cemetery and was requested [sic] to delay the procession, Defendant did not comply and thereby prevented Plaintiff from accompanying the hearse to the place of burial;

(h) In not accompanying the decedent's body to its final resting place;

(i) In failing to instruct and supervise his employees in the performance of the funeral services and transportation of the deceased;

(j) In allowing the hearse to travel to the place of burial when the same was not accompanied by the Plaintiff and other mourners; and

(k) In failing to perform under the contract in accordance with the standards of his profession.

According to the petition, by reason of the breach, Meyer suffered mental anguish, severe disturbance of mental and emotional tranquility and a heart attack, and required medical attention and hospital confinement.

With respect to Division II, trial court held it appeared to state a cause of action in those states which had adopted special rules pertaining to the contractual relationships between morticians and relatives of dece-

dents, but that the Supreme Court of Iowa would not, in the absence of trauma, recognize a cause of action for the recovery of damages for emotional distress arising out of a breach of contract unless defendant's conduct were such as would normally support an award of punitive damages.

■ The issue of whether to allow an action for recovery of damages for emotional distress arising out of a breach of contract to perform funeral services is one of first impression in this jurisdiction. It is hornbook law that damages resulting from breach of contract are recoverable only for those injuries which may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as the probable result of the breach. See 5 Corbin on Contracts § 1007, p. 70 (1964); *New Hampshire Insurance Company v. Christy,* 200 N.W.2d 834, 844 (Iowa 1972); *Gildner Bros. v. Ford Hopkins Co.,* 235 Iowa 191, 198, 16 N.W.2d 229, 233; *Hadley v. Baxendale,* 9 Exch. 34, 156 Eng. Rep. 145 (1854). Accordingly, this court, in *Smith v. Sanborn State Bank,* 147 Iowa 640, 126 N.W. 779, declined to allow the recovery of damages for mental anguish arising from the breach of a contract to pay money, holding such damages were too remote. In the same opinion, however, this court noted such recovery had been allowed in cases growing out of contract rights and relations where breach of the contract also constituted a tort. Notable in this class of cases were those involving negligence in the transmission and delivery of telegrams. See *Mentzer v. Western Union Telegraph Co.,* 93 Iowa 752, 62 N.W. 1; *Cowan v. Western Union Telegraph Co.,* 122 Iowa 379, 98 N.W. 281.

The case before us, however, presents a situation different from that of the normal commercial contract. This is acknowledged in 25 C.J.S. Damages § 69, p. 828:

"Where the character of the contract is of such a nature that a natural and probable consequence of the breach will be to inflict mental pain or anguish on the person to whom performance is due, some courts have held that the parties may be presumed to have contracted with respect to mental anguish as an element of damages and that a recovery may be had therefor."

In *Stewart v. Rudner,* 349 Mich. 459, 84 N.W.2d 816, the Supreme Court of Michigan authorized recovery of damages for mental anguish arising out of the breach of a contract to perform a Caesarean section for delivery of a child. After acknowledging damages for mental anguish are not recoverable for the breach of ordinary commercial contracts, the court said at page 823 of 84 N.W.2d:

"Yet not all contracts are purely commercial in their nature. Some involve rights we cherish, dignities we respect, emotions recognized by all as both sacred and personal. In such cases the award of damages for mental stress and suffering is a commonplace, even in actions *ex contractu.*"

At the next page, the court continued:

"When we have a contract concerned not with trade and commerce but with life and death, not with profit but with elements of personality, not with pecuniary aggrandizement but with matters of mental concern and solicitude, then a breach of duty with respect to such contracts will inevitably and necessarily result in mental anguish, pain and suffering. In such cases the parties may reasonably be said to have contracted with reference to the payment of damages therefor in event of breach. Far from being outside the contemplation of the parties they are an integral and inseparable part of it."

The above principles are equally applicable to contracts for the performance of professional funeral services. The question before us has been considered by courts in a number of jurisdictions, and we believe the enlightened view is to allow the action proposed. See generally, Annot., 17 A.L.R.2d 770 (1951).

■ Where one holds himself out as specially qualified to perform the services inci-

dent to a funeral and burial, unless there is express contrary agreement, it is implied in a contract for such services that such person will exercise proper skill and perform the contract obligations in a workmanlike manner. See 17A C.J.S. Contracts § 329, pp. 292–293; *Lamm v. Shingleton,* 231 N.C. 10, 55 S.E.2d 810. This court has found a similar implication in construction contracts, *Busker v. Sokolowski,* 203 N.W.2d 301, 303 (Iowa 1972); *Markman v. Hoefer,* 252 Iowa 118, 123, 106 N.W.2d 59, 62.

In *Lamm v. Shingleton, supra,* a widow had commenced an action against a funeral home for breach of a contract to conduct a funeral for her deceased husband. The plaintiff claimed damages for mental anguish as the result of the defendant's failure to properly provide a watertight burial vault and casket. After reviewing case authority, the Supreme Court of North Carolina said, at p. 813 of 55 S.E.2d:

"Where the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the contract that such suffering will result from its breach, compensatory damages therefor may be recovered. [citations]. In such case the party sought to be charged is presumed to have contracted with reference to the payment of damages of that character in the event such damages should accrue on account of his breach of the contract."

At pp. 813–814, the court continued:

"The tenderest feelings of the human heart center around the remains of the dead. When the defendants contracted with plaintiff to inter the body of her deceased husband in a workmanlike manner they did so with the knowledge that she was the widow and would naturally and probably suffer mental anguish if they failed to fulfil their contractual obligation in the manner here charged. The contract was predominantly personal in nature and no substantial pecuniary loss would follow its breach. Her mental concern, her sensibilities, and her solicitude were the prime considerations for the contract, and the contract itself was such as to put the defendants on notice that a failure on their part to inter the body properly would probably produce mental suffering on her part. It cannot be said, therefore, that such damages were not within the contemplation of the parties at the time the contract was made."

We note other courts have employed substantially identical rationales in allowing this type of recovery. See, e. g., *Clark v. Smith,* 494 S.W.2d 192 (Tex.Civ.App.1973); *Pat H. Foley & Company v. Wyatt,* 442 S.W.2d 904 (Tex.Civ.App.1969); *Chelini v. Nieri,* 32 Cal.2d 480, 196 P.2d 915.

■ We subscribe to the above pronouncements and believe them to be applicable to the instant case. Accordingly, we hold that recovery of damages may be had in appropriate cases for mental distress, absent physical trauma, arising out of the breach of a contract to perform funeral services.

■ The materials before the court, viewed in the light most favorable to Meyer, present sufficient material evidence from which the trier of fact could find a breach by Nottger of the implied promise to exercise proper skill and perform the contract obligations in a workmanlike manner. There is also evidence from which the trier of fact could find Meyer suffered severe emotional distress as the result of such alleged breach. We cannot say as a matter of law that Meyer may not recover the compensatory damages he seeks.

Because the record discloses genuine issues of material fact, we must hold trial court erred in sustaining defendant's motion for summary judgment with respect to Division II of Meyer's petition.

III. *Exemplary Damages.*

■ Finally, we consider the issue of the exemplary damages sought by Meyer in

each division of his amended and substituted petition. We believe trial court erred in ruling there was no evidence in the record to support such a claim. Again, we view the record in the light most favorable to Meyer.

█ Exemplary damages are not intended to be compensatory. *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975). An award of exemplary damages is never made as a matter of right, but depends upon whether under the facts in a particular case such award is appropriate in order to punish an offending party or discourage others from similar wrongful conduct. *Earl v. Clark,* 219 N.W.2d 487, 491 (Iowa 1974).

The issue of what manner of conduct is necessary for an award of exemplary damages was explored by Judge Graven of the federal district court in *Amos v. Prom,* 115 F.Supp. 127 (N.D.Iowa 1953). Judge Graven carefully collected and analyzed the Iowa decisions and concluded exemplary damages had been permitted in cases involving fraud, gross negligence or an illegal act. In *Syester v. Banta,* 257 Iowa 613, 628–629, 133 N.W.2d 666, 676, this court adopted the following summary by Judge Graven at 115 F.Supp. 136–137:

> "The rule would seem to be: exemplary damages may be awarded where defendant acts maliciously, but malice may be inferred where defendant's act is illegal or improper; where the nature of the illegal act is such as to negative any inference of feeling toward the person injured, and is in fact consistent with a complete indifference on the part of defendant, liability for exemplary damages is not based upon the maliciousness of the defendant but is based, rather, upon the separate substantive principle that illegal or improper acts ought to be deterred by the exaction from the defendant of sums over and above the actual damage he has caused."

█ In the context of exemplary damages, it is not necessary to show defendant's actual spite or wicked intent. Such damages are allowable upon a showing of legal malice, which may be established by demonstrating wrongful or illegal conduct committed or continued with a willful or reckless disregard of another's rights. *Hagenson v. United Telephone Company of Iowa,* 209 N.W.2d 76, 82 (Iowa 1973); *McCarthy v. J. P. Cullen & Son Corp.,* 199 N.W.2d 362, 369 (Iowa 1972). Legal malice has also been defined as the intentional commission of a wrongful act without just cause or excuse. *Hagenson* and *McCarthy, supra.* Evidence of malice is rarely direct, and may be circumstantial. *Northrup v. Miles Homes, Inc. of Iowa,* 204 N.W.2d 850, 859 (Iowa 1973).

From the record before us, we cannot say as a matter of law that Meyer raised no triable issue of fact with respect to exemplary damages. If we accept as true Meyer's version of the facts, it is indeed possible to infer from a number of Nottger's actions wrongful conduct in willful or reckless disregard of Meyer's rights. Again we believe trial court erred.

In his brief on appeal Nottger asserts there can be no recovery of exemplary damages in a case which requires a showing akin to legal malice merely for the recovery of compensatory damages. Citing *Curnutt v. Wolf,* 244 Iowa 683, 57 N.W.2d 915 and *Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157, he contends that, "Courts are uniform in holding that you simply can't add anything to a cause of action which requires proof of malice by proving malice." This assertion cannot be reconciled with our affirmance in *Northrup v. Miles Homes, Inc., of Iowa, supra.*

Finally, with regard to the matter of allowance of exemplary damages upon a theory of breach of contract, we direct attention to *Kuiken v. Garrett,* 243 Iowa 785, 799–800, 51 N.W.2d 149, 157–158. See also *Engel v. Vernon,* 215 N.W.2d 506, 516–517 (Iowa 1974).

IV. We conclude trial court erred in sustaining defendant's motion for summary judgment. We accordingly reverse and remand for proceedings in conformance with this opinion.

REVERSED AND REMANDED.