**Ronald J. BLONG, Plaintiff-Appellant,**

**v.**

**Larry SNYDER, Duane Byers, and John Culbertson, Defendants,**

**David Lillegraven and Brice Menzie, Defendants-Appellees.**

No. 83–981.

Court of Appeals of Iowa.

Nov. 20, 1984.

Charles H. Levad, Mason City, for plaintiff-appellant.

Richard R. Winga and J. Mathew Anderson of Laird, Burington, Heiny, McManigal, Walters & Winga, Mason City, for defendants-appellees.

Heard by OXBERGER, C.J., and SNELL and HAYDEN, JJ., but considered en banc.

HAYDEN, Judge.

The plaintiff, Ronald Blong, was employed as a machine operator at the White Farm Equipment Company in Charles City

for nineteen years. In late 1977 he was accused of falsifying a time card and was fired. He denied the accusation and challenged the discharge by filing union grievance proceedings, an age discrimination complaint, and a complaint with the National Labor Relations Board. After several months, the company and the union reached a negotiated settlement providing for Blong's reinstatement. Blong alleges that after his reinstatement he was harassed unmercifully by supervisory personnel. He resigned less than four months after the reinstatement upon his doctor's orders.

Blong later filed the present lawsuit against five supervisory and managerial employees of White Farm Equipment, alleging the tort of intentional infliction of emotional distress. He based this lawsuit both on the 1977 discharge and on the alleged campaign of harassment after his reinstatement.

At the close of the plaintiff's evidence, the trial court granted a motion for direct verdict as to three of the five defendants. That ruling is not challenged in this appeal.

Trial proceeded as to the other two defendants, David Lillegraven and Brice Menzie, who had exercised direct day-to-day supervision over Blong. At the conclusion of the trial, the jury awarded Blong $100,000 in compensatory damages and $50,000 in punitive damages against Lillegraven and Menzie. Lillegraven and Menzie filed motions for judgment notwithstanding the verdict; the trial court sustained these motions and vacated the verdicts. The trial court concluded that the plaintiff's evidence did not establish "outrageous conduct," one of the elements of the tort of intentional infliction of emotional distress.

Blong has appealed from the judgment notwithstanding the verdict in favor of Lillegraven and Menzie. He contends there was sufficient evidence of "outrageous conduct" to support the verdict.

Plaintiff began employment as a machine operator with White Farm Equipment Company in January, 1959. In 1977, his immediate supervisor was David Lillegraven.

Menzie was a general supervisor and had direct supervision over Lillegraven. In 1977, plaintiff was working the first shift, operating two machines, one called the excello and the other the moog. The excello ran from a computer and the moog ran from a tape, either paper or plastic. Two other shifts used the same machines. Normally, plaintiff was paid on piecework basis. If one machine was not in operation, the employee was to get a red card and go on an hourly rate of pay. There was evidence, however, that supervisors had considerable reluctance to issue red cards because it reflected poorly on the department's productivity.

On October 31, 1977, plaintiff was asked if he would assist the Methods Department of White Farm in cutting a new tape for the moog. Plaintiff asked Lillegraven for permission, which was granted. Plaintiff testified that Lillegraven told him that he should "take it up on the rate." Plaintiff understood this to mean that he should manipulate his time cards so that he could maintain his rate of pay on the piecework basis. On November 1 and November 2, 1977, plaintiff continued to assist Methods in cutting a new tape.

On November 11, 1977, Menzie and Lillegraven received printouts from the Accounting Department from which they concluded that plaintiff was stealing. At trial, however, Lillegraven testified that although the time cards were improperly done, he did not think plaintiff had stolen anything. Lillegraven called plaintiff to the office of the Industrial Relations Manager, John Culbertson. Plaintiff went to Culbertson's office with a union representative.

After a discussion between company and union officials, the company and the union agreed on a charge of falsification of company records and the plaintiff was discharged. Lillegraven and Menzie characterized plaintiff's actions as "stealing."

Plaintiff immediately filed a grievance with the union. A meeting was held in the plant manager's office at which neither

Menzie nor Lillegraven were present. Plaintiff was given an opportunity to explain what happened. Plaintiff was not reinstated in his job at this time.

Plaintiff then asked the union for arbitration. Ultimately he filed charges against his local union and the company with the NLRB. He also filed a complaint alleging age discrimination.

After negotiations between the company and the union, plaintiff was reinstated with full seniority and some back pay. On April 8, 1978, he was taken to Culbertson's office. Menzie was present. Culbertson told him that he was to go to Lillegraven if his machine was down, his card was to be initialed immediately, he was to follow all rules, he was to do his job properly, he was not to visit on the job, and he was required to stamp the parts which he made. Plaintiff agreed to these conditions and returned to work on April 11, 1978, in the same job with the same rate of pay, on the same shift, and with the same supervisors.

Shortly after plaintiff returned to work, he told Lillegraven that his machine was not working properly. Lillegraven responded, "I'm not your baby-sitter." On April 15, 1978, Lillegraven stopped by his machine and told Blong "you are a dumb ... (expletive deleted) for not having your machine running." Blong testified that the reason the machine had not been running was that it had not been properly laid out by the second shift. When people stopped at plaintiff's machine to talk, Menzie would order them away. On April 24, plaintiff advised Lillegraven that his machine was broken down and he needed it repaired. Lillegraven responded that "You just don't want to run the machine and you broke it down on purpose."

On April 25, Lillegraven told plaintiff that Snyder had told Lillegraven that all the parts that plaintiff had run were all scrap. A check of the parts later proved that they were good and no disciplinary slips were filed.

On April 28, plaintiff asked Lillegraven for time off so that he could take his wife to Waterloo for a doctor's appointment.

Lillegraven said that plaintiff's "old lady didn't run the place." Plaintiff took the day off and he was entitled to a "random day." When he returned the following day, he was brought before Culbertson and charged with taking time off without permission. Culbertson determined that there had been a misunderstanding between plaintiff and Lillegraven and no discipline was meted out.

On May 3, Lillegraven and Menzie confronted plaintiff with pieces of a filter body which they alleged to be scrap and without a stamp; Blong testified those were not his pieces.

On May 10, Menzie and Lillegraven came to plaintiff's machine and told him the pieces he had run were all "shit." Lillegraven presented him with a copy of the company employee's handbook in which Lillegraven had circled fifteen company rules that plaintiff had allegedly violated. Lillegraven stated if plaintiff didn't "shape up," he was "going out the door."

Also during May, 1978, Menzie accused plaintiff of sitting and doing nothing. Plaintiff testified that he had run out of parts to work on and was waiting for the truck to deliver more. On another occasion, as plaintiff was returning from the restroom, Lillegraven accused him of "playing with himself" in the restroom. On yet another occasion when plaintiff went to get some tooling sharpened, Menzie accused plaintiff of "goofing off." He was again accused of "stealing" time.

In July, 1978, the company took its annual two-week vacation. Plaintiff consented to work during the vacation. During this period he was ordered to make parts for which there were no patterns or tools. Plaintiff admitted that he ran bad parts and that he did not stamp the parts. He said that his vacation supervisor told him that he did not have to stamp the parts.

On August 4, Menzie described the vacation pieces as "shit" and allegedly said "You might have got us with a discrimination suit, but we'll get you this time"; he stated that they were going to give all

three of the persons working on the machine three notices and then fire them.

Plaintiff asked Lillegraven if he was going to get a notice and Lillegraven said yes. On August 7, in the presence of a union representative, he was given a disciplinary notice for running scrap. On August 8, with a union representative present, he was given a disciplinary notice for failing to stamp his parts, or for failure to follow orders.

The evidence shows that operators for all three shifts received disciplinary reports for the excello and moog operations in July, 1978.

Prior to October, 1977, plaintiff had a good work record and had received several reports from Lillegraven, indicating that he had performed very well on the job. The evidence further showed that in October and November, 1977, plaintiff made out his own time cards. The evidence also showed that Lillegraven used rough language to all persons he supervised, some thirty in number.

After receiving the notice on August 8, 1978, plaintiff left the plant and did not return to work upon his doctor's orders.

■ The elements necessary to establish a prima facie case of intentional infliction of emotional distress are as follows:

(1) Outrageous conduct by the defendant;

(2) The defendant's intention of causing, or reckless disregard of the probability of causing emotional distress;

(3) The plaintiff's suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Amsden v. Grinnell Mutual Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972).

There is no dispute that the plaintiff suffered severe emotional distress as a result of the events described above. After terminating his employment, Blong began treatment with Dr. Ronald Larson, a psychiatrist. He was prescribed Norpramin and Stelazine which isolated him into a cocoon and protected him from the outside. He could not go out of the house; all he did was lie in bed. He was ashamed to face his family.

Blong saw Larson for four years. He. was diagnosed as suffering from primary affective illness of the depressed type. During this time he was treated with medication. Blong was totally disabled from the disease and received disability payments until February, 1983. The doctor testified that the plaintiff's illness was triggered by stress in the plaintiff's job situation, by criticism, and by the accusations that he was stealing from the company.

The sole question is whether the trial court's determination that the defendants' conduct was not outrageous and the grant of the judgment notwithstanding the verdict was proper.

■ When reviewing an order granting a defendant's motion for judgment notwithstanding the verdict, we view the evidence in the light most favorable to the plaintiff. *Watson v. Lewis*, 272 N.W.2d 459, 461 (Iowa 1978). This is true regardless of whether such evidence is contradicted. *Schlitz v. Cullen-Schiltz & Associates, Inc.*, 228 N.W.2d 10, 17 (Iowa 1975). Every legitimate inference which can be reasonably made from the evidence is considered, and if reasonable minds can differ on the issue, it is for the jury to decide. *Id.*

The Iowa Supreme Court has not defined "outrageous conduct" when the cause of action for intentional infliction of emotional distress stems from an employer-employee conflict. However, this phrase has been defined in other actions for intentional infliction of emotional distress as "conduct exceeding all bounds usually tolerated by decent society." *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976) (manner in which mortician dealt with the body of plaintiff's father and conducted burial services stated a valid cause of action for intentional infliction of emotional distress). *Amsden v. Grinnell Mutual Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972) (insurance company's failure to immediately pay fire

loss claim not "outrageous conduct" in action for intentional infliction of emotional distress).

The Restatement (Second) of Torts, which was cited favorably by the Iowa Supreme Court in both *Meyer* and *Amsden,* provides:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

The liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where some one's feelings are hurt. There must still be freedom to express an unflattering opinion, and some safety valve must be left through which irascible tempers may blow off relatively harmless steam.

Restatement (Second) of Torts § 46 comment (d) (1955).

The three issues relevant to the determination of whether the trial court acted properly are: (1) whether the relationship between the defendant and the victim of the alleged tort is one that imposes on the defendant a greater obligation to refrain from subjecting the victim to abuse, fright, or shock than would be true in an arm's length encounter between strangers; (2) whether the acts alleged qualify as outrageous conduct; and (3) whether there is evidence from which a reasonable jury may find that the defendant conducted himself in that manner. *Hall v. May Dept. Stores Co.,* 292 Or. 131, 637 P.2d 126, 130 (1981).

Other courts have held that the plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to the defendants. *Alcorn v. Anbro Engineering, Inc.,* 2 Cal.3d 493, 498, n. 2, 468 P.2d 216, 218, 86 Cal.Rptr. 88, 90 (1970). *See, also Contreras v. Crown Zellerbach Corp.,* 88 Wash.2d 735, 741–42, 565 P.2d 1173, 1176–77 (1977). We agree that plaintiff's status as an employee entitled him to more protection from insultive or abusive treatment than would be expected in interactions between two strangers.

The more difficult question is whether the defendants' conduct constitutes "outrageous conduct." The defendants cite three cases in support of a finding that the conduct in this case was not outrageous. All three of these cases discussed "outrageous conduct" under Florida law and in all three cases the court found that the employer's conduct was not considered outrageous. *Mundy v. Southern Bell Telephone and Telegraph Co.,* 676 F.2d 503, 505–06 (11th Cir.1982) (harassment by supervisory employees after plaintiff refused to continue in scheme to falsify expense vouchers not outrageous conduct); *Lay v. Roux Laboratories, Inc.,* 379 So.2d 451, 452–53 (Fla. Dist.Ct.App.1980) (threats of job loss, use of humiliating language, verbal attacks and racial epithets not outrageous conduct); and *Food Fair, Inc. v. Anderson,* 382 So.2d 150, 151–53 (Fla.Dist.Ct.App.1980) (subjecting employee to polygraph tests to determine whether she was stealing and to use test results to induce her to sign state-

ments admitting guilt not outrageous conduct).

Other courts have dealt with cases involving equally egregious or even less egregious behavior by an employer and have found that it was "outrageous conduct." *See Hall v. May Dept. Stores Co.*, 292 Or. 131, 637 P.2d 126, 131–32 (1981) (employer's accusations of theft based on scanty evidence, interrogation of employee, and threats to arrest constitute outrageous conduct); *Smithson v. Nordstrom, Inc.*, 63 Or.App. 423, 664 P.2d 1119, 1120–21 (1983) (where employee was interrogated for three hours about suspected theft and was threatened with prosecution on scanty evidence if she did not sign a confession, there was sufficient evidence to generate a jury question on issue of outrageous conduct); *Agarwal v. Johnson*, 25 Cal.3d 932, 947, 603 P.2d 58, 66–67, 160 Cal.Rptr. 141, 150 (1979) (use of racial epithet, abuse of position in a manner designed to humiliate the employee, and recommending that the employee be fired for reasons that were not true is outrageous conduct); *Counce v. M.B.M. Co., Inc.*, 266 Ark. 1064, 597 S.W.2d 92, 94–95 (Ark.Ct.App.1979) (employee discharged after checks were found missing, even though she did pass a polygraph test, did state a cause of action for intentional infliction of emotional distress).

■ While we find the question of what constitutes outrageous conduct is a difficult one, we conclude reasonable minds could differ on the issue and, therefore, a jury question was generated. Viewing the evidence in the light most favorable to plaintiff, the record shows that plaintiff was initially dismissed for filling out his time cards in accordance with his supervisor's instructions. After he was finally able to get his job back, plaintiff was subjected to verbal abuse on almost a daily basis. He was accused of stealing, wasting time, intentionally breaking his machine, intentionally producing inferior parts, violating fifteen company rules, and "playing with himself" in the restroom. All of these accusations were apparently groundless. Furthermore, plaintiff was assigned extra

work without being given the proper patterns or tools for the job and was then berated, threatened, and disciplined for his inability to properly complete the task. While any of the individual instances alone may be no more than insulting and humiliating, the jury could properly conclude that the whole of defendant's actions over the four-month period were a course of conduct "exceeding all bounds usually tolerated by decent society."

Therefore, the decision of the trial court granting defendant's motion for judgment n.o.v. is reversed and the case is remanded for reinstatement of the jury's verdict.

REVERSED AND REMANDED.

All Judges concur except SNELL and SACKETT, JJ., who dissent.

SNELL, Judge (dissenting).

I respectfully dissent. I do not believe that the conduct of the defendants in this case satisfies the legal requirements necessary to generate a jury issue. To establish a prima facie case of intentional infliction of emotional distress, one of the elements required by law is that defendant's conduct be "outrageous." *Amsden v. Grinnell Mutual Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972). A guide to the meaning of "outrageous" is provided in *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976), where it is said to be "conduct exceeding all bounds usually tolerated by decent society."

The conduct must be looked at not in the abstract but under the working conditions prevailing. All of the conduct occurred in the factory workplace where plaintiff worked as a machine operator. The actions of defendants extended over a relatively short period of time—four months. At that time, plaintiff had already worked there for eighteen years. Plaintiff's difficulties in 1977 when he was discharged and subsequently reinstated do not appear to be from harassment and so do not bear on this case.

In judging whether defendants' conduct is "legally outrageous," it is improper to

look at the medical and emotional problems experienced by plaintiff. The conduct is either outrageous or not, regardless of the effect it might have on an individual plaintiff. In this case, the language was spoken in a factory setting. While the words used are not decorous, neither are they extraordinary or even uncommon among factory workers. This is not to say that plaintiff is expected to endure the epithets hurled about under battlefield conditions. But we are also considering an atmosphere different from that surrounding a church meeting or a string quartet recital.

Not every case satisfies the legal elements necessary before a case is submissible to a jury. That is what judges are trained to decide. I believe the trial judge here correctly determined that the conduct does not meet the legal test for "outrageous." It is not as The Restatement has said and the Iowa Supreme Court has adopted, conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46 Comment (d) (1955) *cited* in *Meyer v. Nottger*, 241 N.W.2d 911 (Iowa 1976), and *Amsden v. Grinnell Mutual Reinsurance Co.*, 203 N.W.2d 252, 255 (Iowa 1972).

I also believe that defendants were acting in the belief that they were furthering the interests of their employer in a legal way. As such, their actions would not create liability. Comment g, Section 46, Restatement of Torts is applicable:

> The conduct, although it would otherwise be extreme and outrageous, may be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.

I would affirm the trial court's sustaining of defendants' motion for judgment N.O.V.

SACKETT, J., joins this dissent.