Roger R. LYONS and Gretchen A. Eddy, Plaintiffs,

v.

MIDWEST GLAZING, L.L.C., d/b/a Eddy's Glass & Door, Defendant.

No. C01–3071–MWB.

United States District Court, N.D. Iowa, Central Division.

Dec. 18, 2002.

Randall E. Nielsen, Pappajohn, Shriver, Eide, Nicholas, Mason City, IA, for Plaintiffs.

Mark L. Zaiger, Patricia L Hoffman-Simanek, Shuttleworth & Ingersoll, Cedar Rapids, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................1033
 A. *Procedural Background* ........................................1033
 B. *Factual Background* ..........................................1034

II. *LEGAL ANALYSIS* .................................................1039
 A. *Standards For Summary Judgment* ...............................1039
 1. *Requirements of Rule 56* ..................................1039
 2. *The parties' burdens* ....................................1040
 B. *Abuse Of Process Claim* ......................................1040
 1. *Legal Process Requirement* ...............................1040
 2. *Improper Purpose Requirement* ............................1042
 C. *Defamation Claims* ...........................................1043
 1. *Slander Claim* ...........................................1044
 2. *Qualified Privilege Immunity To Libel Claim* .............1046
 a. *Good faith* ..........................................1046
 b. *Interest to be upheld* ...............................1047
 c. *Scope of statements* .................................1047
 d. *Proper occasion, manner and party* ...................1047
 D. *FMLA Claim* ..................................................1047
 E. *Contract Damages* ............................................1047
 1. *Emotional distress damages under contract claim* .........1048
 2. *Damages beyond the date of Lyons' new employment* .......1050
 F. *Punitive Damages* ............................................1051

III. *CONCLUSION* ...................................................1051

## I. INTRODUCTION

### A. Procedural Background

On July 23, 2001, plaintiffs Roger R. Lyons and Gretchen A. Eddy filed this lawsuit in the Iowa District Court In And For Winnebago County against Midwest Glazing, L.L.C. ("Midwest Glazing"), d/b/a Eddy's Glass & Door ("Eddy's Glass"). Midwest Glazing removed this case to this court on August 21, 2001, pursuant to 28 U.S.C. § 1441. In their petition, plaintiffs assert claims for breach of contract, abuse of process, defamation, violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, violation of the Fair Labor Standards Act ("FSLA"), 29 U.S.C. § 201, and punitive damages against Midwest Glazing.[1] Specifically, plaintiff Lyons asserts that Midwest Glazing has breached a sales contract that it would not to terminate Lyons's employment without good cause. On March 28, 2002, Midwest Glazing filed an amended and substituted answer in which it asserted counterclaims against Lyons for tortious interference and breach of fiduciary duty.

On November 4, 2002, Midwest Glazing filed a motion for partial summary judgment. In its motion, Midwest Glazing moves for summary judgment on plaintiff

---

1. Plaintiff Lyons has accepted Midwest Glazing's offer of judgment with respect to Lyons's claim that Midwest Glazing violated the FSLA.

Lyons's claims for abuse of process, defamation and violation of the FMLA. Defendant Midwest Glazing also seeks partial summary judgment relating to damages recoverable for breach of contract and punitive damages. On November 27, 2002, plaintiff Lyons filed a resistance to Midwest Glazing's motion for partial summary judgment.

Pursuant to Midwest Glazing's request, the court held telephonic oral arguments on Midwest Glazing's motion for partial summary judgment on December 6, 2002. At the oral arguments, plaintiff Lyons was represented by Randall E. Nielsen of Pappajohn, Shriver, Eide & Nicholas, P.C., Mason City, Iowa. Defendant Midwest Glazing was represented by Mark L. Zaiger of Shuttleworth & Ingersoll, P.L.C. The court turns first to a discussion of the undisputed facts as shown by the record, then to the standards applicable to motions for summary judgment and, finally, to the legal analysis of whether Midwest Glazing is entitled to summary judgment on any of the claims at issue in this litigation.

## B. Factual Background

The following facts are undisputed. Eddy's Glass & Door was formed by Douglas Eddy as a glazing and overhead door company. In 1976, Douglas Eddy married Gretchen Lyons. Gretchen Lyons changed her name to Gretchen Eddy. Plaintiff Roger Lyons is the son of Gretchen Eddy from a previous marriage. Lyons worked at Eddy's Glass for his stepfather when he was in high school and began working full time for Eddy's Glass in 1987. Douglas Eddy died on October 31, 1996. Douglas Eddy's will provided that the business be sold and the proceeds of the sale made part of his estate. The business was not willed to Roger Lyons. Gretchen Eddy was the sole beneficiary of Douglas Eddy's estate.

Gretchen Eddy, through her counsel, attempted to find buyers for the business.

Midwest Glazing in time bought Eddy's Glass. A sales agreement was executed on December 29, 1997, by Gretchen Eddy for the estate of Douglas Eddy, Midwest Glazing and Iowa Glass Depot, Inc. ("Iowa Glass"). Iowa Glass purchased the real estate and Midwest Glazing purchased the business assets. Midwest Glazing operated the business after the transaction.

Gretchen Eddy wanted the sale of the business to Midwest Glazing to provide her son with job security. She intended that her son would benefit from the sale of Douglas Eddy's business. As a result, paragraph seven of the Sales Agreement provided:

> 7. Buyer agrees to offer employment to all employees currently employed by Eddy's Glass and Door as of said date of closing for a period of not less than six months from said date and further agrees to maintain the employment of key employees, namely: Kermith Balvance and Roger Lyons subject only to termination for cause on the part of said employees or voluntary resignation or termination at the option of said employees.

Defendant's App. at 5.

Roger Lyons was first offered the position of manager at Eddy's Glass by Midwest Glazing but declined the offer. After Lyons turned down the position, Kermith Balvance took the position as manager at Eddy's Glass. In December 1998, Randy Taylor replaced Balvance as manager. He remained as manager until March, 2000. Balvance resumed being the manager of Eddy's Glass when Taylor was fired. Balvance continues to work for Eddy's Glass. On December 18, 2000, Balvance voluntarily stepped down as manager and was replaced by Julie Weide.

For the first four months after Midwest Glazing purchased Eddy's Glass, Lyons was an hourly employee. On May 1, 1998,

Midwest Glazing placed Lyons solely in charge of managing the overhead door side of the business at Eddy's Glass and he became a salaried employee. Lyons declared himself to be the Product Manager and purchased a stamp that indicated such. Lyons's increased responsibilities included scheduling, estimating bids, ordering parts, supervising crews, and installing doors when needed.

As part of company policy, Midwest Glazing instituted a paid time-off program that replaced separate vacation and sick leave policies. Eddy's Glass employees received a certain number of paid hours each year. Under the program, Lyons received 160 hours per year in paid time-off to use for vacation, sick leave, or personal reasons. In 1999, Randy Taylor, as manager of Eddy's Glass, kept track of Lyons's use of paid time-off. Based on the 1999 information spreadsheet, Midwest Glazing believed that Lyons had abused the paid time-off policy in 1999. As a result, Midwest Glazing continued to track Lyons's use of the paid time-off policy in 2000. Midwest Glazing asserts that Lyons abuse of the paid time-off policy is one of the reasons why it ultimately discharged him. Lyons asserts that on several of the days that he took off, he came back to the office and worked late making up the hours. After being presented with the 2000 spreadsheet indicating that his paid time-off hours were all used up, Lyons took seven days off work for vacation. Lyons's employment was terminated on January 2, 2001. When Lyons was fired, Midwest Glazing told him that it was because he was a "poison pill" who brought down company morale and because he had abused the company's paid time-off policy in 2000. On January 30, 2001, Lyons obtained employment with Advance Door Systems in Forest City, Iowa. Advance Door Systems sells and installs garage doors. It is owned by Holland Contracting. Holland Contracting hired Lyons as the manager

of Advance Door Systems. Lyons has made more money with Advance Door Systems as a salaried employee than as a salaried employee with Eddy's Glass. Lyons's duties and responsibilities at Advance Door Systems are similar to what his duties and responsibilities were at Eddy's Glass. Lyons was frustrated while at Eddy's Glass because the company decisions were made by the Cedar Rapids office instead of the Forest City office. He does not have such frustrations at Advance Door Systems.

After Lyons's termination, employees of Eddy's Glass determined that some samples, parts, and other items were missing from the company. Doug Cronkwright, an employee of Eddy's Glass, indicated that Lyons had materials at his house and his mother's house. Joe Driscoll, Midwest Glazing's operations manager, was notified by Eddy's Glass's manager, Julie Weide, about these allegations. Driscoll consulted with an employee at Iowa Glass, Orlie Workman, a former Linn County Sheriff, who assists with security for Iowa Glass. Workman recommended that Driscoll contact the county sheriff to ascertain the proper method for determining whether Lyons had taken company product with him. Pursuant to this recommendation, Eddy's Glass's manager, Weide, contacted the Winnebago County Sheriff, who in turn directed her to contact the Forest City Police Department. Driscoll was unfamiliar with the search warrant process and wanted to make sure the company was following the correct procedure. Therefore, Driscoll talked with Forest City Assistant Police Chief Dan Davis. Assistant Chief Davis has been with the Forest City Police Department for thirty years.

On January 16, 2001, following his discussion with Assistant Chief Davis, Driscoll wrote the following statement addressed to "To Whom It May Concern:"

Roger Lyons was released from his employment at Eddy's Glass & Door on Jan. 2nd. His termination was based on a repeat violation of company policy. At the time of his termination, it was requested that he was to turn in all tools, equipment, and property of Eddy's Glass & Door. It was understood, that he honored our request. Today, I have learned that Mr. Lyons has Eddy's property stored at his mother's residence.

Defendant's App. at 23.

As part of the investigation, Julie Weide, operations manager for Eddy's Glass at the time of Lyons's termination, provided the following written statement to the Forest City Police Department:

On December 18, 2000, I started as manger at Eddy's Glass and Door Co. On January 2, 2001, Roger Lyons's position in overhead door sales and installation was terminated. On that day he had one hour to remove his personal property from the premises. Roger Lyons returned to pick up some screw gun accessories that he had left in the van and some clear glass window inserts, which we agree were his.

While I was attending a three-day training program in Cedar Rapids, Roger Lyons returned and took an assortment of display panels off the wall in the showroom. I discovered this on the Friday I returned from my trip.

Also on that day, Doug Cronkwright, employee, reported to me that Lyons was installing new Raynor panels in an overhead door at All Tire Service in Forest City. It is believed that the panels he installed originally came from Eddy's Glass and Door stock. I was also informed that Lyons has overhead garage door material stored at this mother's garage, and has an operator and door installed in his own garage that originally were for display purposes at Eddy's.

On Friday, January 12, after learning of the missing display panels, I informed my supervisor, Jeff Driscoll of Midwest Glazing in Cedar Rapids.

Defendant's App. at 25. Assistant Chief Davis interviewed Weide and concluded that she displayed no behavior that was suspicious or inconsistent. Instead, Davis found Weide to be "very forthright" and a "little reluctant" because of the work relationship she had with Lyons. Defendant's App. at 151. Weide indicated to Davis that she believed that the samples in the showroom were company property. Lyons admits that he does not know what Weide believed and has no evidence that would suggest that Weide did not believe what she wrote.

On January 30, 2001, Doug Cronkwright wrote the following statement, which was provided to the Forest City Police Department, in which he outlined his knowledge that Lyons had taken window samples from Eddy's Glass, his viewing of a garage door and opener at Lyons's home and that Lyons had software from Raynor Garage Doors installed on his home computer:

On three occasions Roger has shown me the Raynor Garage Door and Genie Operator that are installed in his garage at his home. He stated on these occasions that he received the door at a reduced price from Raynor and that he received the Genie Stealth Operator from Midland Doors as a Gift.

Upon Roger's return from his tour at the Raynor Facility in IL. [sic] He showed me several new proto type sample windows that he said he had received as a gift from Raynor.

Some of the windows were:

Antique Black Ranch

Express Brass Colonial

Diamond Colonial

Frosted Sunrise Ranch

Roger returned during the week of his termination and proceeded to take all the windows in our display area.

Windows include: The Above Mentioned

2–Silk Screen Sunburst Ranch

4–Stockton Colonial

Roger also talked about a computer program, received from Raynor, he installed at home on his computer to help him with bids.

Here is a list of some tools that are missing now. We use [sic] to use these on various jobs.

. . .

This Fall Roger and I unloaded some damaged panels into his Mothers [sic] large south-facing garage. At that time Roger showed me his collection of panels and hardware, which were located throughout the right bay.

Defendant's App. at 24.

Lyons had shown Cronkwright several new prototype sample overhead door windows that he had gotten from Raynor. Lyons told Assistant Chief Davis that he had the window samples at his new office location. Lyons received a garage door opener from the Midland Door Company while he was a representative of Eddy's Glass which he later installed in his home. Lyons showed Cronkwright a Raynor garage door that Lyons obtained at a reduced price from Raynor. Lyons admits that he had Raynor's estimating software loaded on his computer hard drive. A software license for Raynor's software was granted to Eddy's Glass and was non-transferrable.

Assistant Chief Davis interviewed the employees of Eddy's Glass to assess their allegations. Davis interviewed Cronkwright about the situation and described him as a friend of Lyons who was "very sincere" but reluctant to talk about the allegations "because he felt he was maybe betraying a friend." Defendant's App. at 152. Lyons admits that he does not have any information that suggests that Cronkwright knowingly provided false information to the Forest City Police Department.

The garage door opener at Lyons's home was the same model that was on an Eddy's Glass invoice that had been given to Assistant Chief Davis. Lyons told Davis that the opener had been given to him as a gift. Lyons admits that he did go to Eddy's Glass after his termination and that he took an assortment of display panels off the wall in the showroom. He also admits that a few days after his firing he returned to Eddy's Glass and left with window samples. Lyons testified that the window samples were samples that he received from Raynor Doors when he went on a factory tour of the facility during his employment with Eddy's Glass as a representative of Eddy's Glass. Lyons admits that the five or six samples that he took from Eddy's Glass now serve as samples for his current employer, Advance Door Systems, a direct competitor of Eddy's Glass in overhead door sales in Forest City.

Lyons did garage door work for All Tire after he was fired by Eddy's Glass. Lyons concedes that he did his work for All Tire with discarded panels from Eddy's Glass and that he received money for the work at All Tire. Lyons admits that much of the handwriting on the bid for All Tire is his handwriting. Lyons also concedes that All Tire might have called him about the job while he was still employed by Eddy's Glass. Assistant Chief Davis found, as part of his investigation, that the panels found on the garage doors at All Tire were Raynor door panels. Davis, however, was never able to determine who owned the panels before they were installed or where they came from.

Based on his investigation, Assistant Chief Davis filed an application for a search warrant. On February 23, 2001, an Iowa magistrate found that probable cause existed to issue a search warrant for Lyons's property and the property of Gretchen Eddy. On February 26, 2001, the Lyons and Eddy properties were searched. The police seized Lyons's home computer. At the request of the police, some employees of Eddy's Glass were present when the searches occurred. Lyons admits that the police and employees from Eddy's Glass acted appropriately during the search. Garage door parts, fittings and equipment were located at the home of Gretchen Eddy. However, employees from Eddy's Glass were unable to confirm whether any of the panels or parts belonged to the company's overhead door inventory. Employees from Eddy's Glass, who were present at the time of the search, identified panels that had been ordered for Gretchen Eddy and belonged to her. Assistant Chief Davis indicated that the employees from Eddy's Glass were "open and forthright," pointing out that particular panels were not the type missing from their inventory.

As part of the investigation to determine ownership of the Raynor samples, Assistant Chief Davis contacted Raynor. Raynor, however, was unwilling to take a position on the issue. Assistant Chief Davis believed that Eddy's Glass had a good faith belief that it owned the samples and that Eddy's Glass's employees believed that the company owned the garage door opener located at Lyons's home. However, the matter was ultimately dropped with the county attorney's decision not to bring charges. In the end, Assistant Chief Davis was unable to confirm one way, or the other, who owned the materials. While the Eddy's Glass's employees believed initially that original software and manuals had been removed, employees la-

ter located the materials and immediately notified Assistant Chief Davis.

While the police were searching Lyons's home on February 26, 2001, his neighbors inquired why the police were at his home. Lyons told his neighbors why the police were there. Tammy Lyons, Roger Lyons's wife, told neighbors that the police were at there home to serve a search warrant. Tammy Lyons has no information or knowledge that suggests that news concerning the search warrant was improperly spread. Tammy Lyons does not know of anyone whose opinion of the Lyons changed as a result of the search warrant. Roger Lyons never received medical treatment, counseling, or psychiatric care that was related to the search warrant.

Lyons alleges that Eddy's Glass employees made statements to a personal friend of Lyons's, Tom Larson, that were defamatory. Lyons alleges that his former coworkers, Kerm Balvance and Steve Rochleau, told Larson that: "it was the best thing that ever happened getting rid of [Lyons], and that [he] didn't do anything there..." Defendant's App. at 109. Lyons claims that other employees told Larson that Lyons didn't do anything but "just sat around." Defendant's App. at 109. Tammy Lyons alleges that Larson told her that Eddy's Glass employees told him that Roger Lyons was "lazy, good for nothing, didn't do anything around here..." Defendant's App. at 129. Roger Lyons never received medical treatment, counseling, or psychiatric care that was related to either his termination or the alleged statements made by Eddy's Glass's employees.

Balvance and Rochleau were employees of Eddy's Glass in January 2001, and remain employees to date. At the time the alleged comments about Lyons were made, neither Balvance or Rochleau were in a management or supervisory position at

Eddy's Glass. Rochleau has never held a position with Eddy's Glass in which he had managerial or supervisory responsibilities. Rochleau has never had any authority to speak on behalf of the company with respect to personnel or employment matters, or with respect to public relations or public statements. Balvance has held no management or supervisory role with the company since December 18, 2000. Since December 18, 2000, Balvance has had no duties involving the evaluation of supervision of production of others. Balvance's job responsibilities have never included public relations or the making of statements on behalf of the company.

Midwest Glazing is a separate corporate entity but is a 100 percent wholly owned subsidiary of Iowa Glass Depot, Inc. ("Iowa Glass"). The corporate headquarters for Iowa Glass and its subsidiaries is in Cedar Rapids. Midwest Glazing does share certain corporate functions with other entities owned by Iowa Glass. Such corporate functions include human resources, accounting, information technology, credit, collections, fleet management, invoicing, and receivables. With respect to corporate functions, Midwest Glazing and other Iowa Glass subsidiaries are charged the fair market value of the shared services.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); *Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501

(N.D.Iowa 1997), *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.), *cert. denied,* 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347 (8th Cir.2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). The essentials of these standards for present purposes are as follows.

### 1. Requirements of Rule 56

Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(a)-(c) (emphasis added). Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.,* 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.,* 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Ra-*

*dio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson,* 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears,* 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel,* 953 F.2d at 394.

#### 2. The parties' burdens

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); *see also Rose–Maston,* 133 F.3d at 1107; *Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Rather, the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.,* 122 F.3d 559, 562 (8th Cir.1997), *cert. denied,* 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof,

then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.,* 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348; *Quick,* 90 F.3d at 1377 (same). With these standards in mind, the court turns to consideration of defendant Midwest Glazing's motion for partial summary judgment.

### B. Abuse Of Process Claim

#### 1. Legal Process Requirement

■ Defendant Eddy's Glass initially contends that plaintiff Lyons's claim for abuse of process fails as a matter of law. Defendant Eddy's Glass contends that the mere reporting of possible criminality does not constitute use of the legal process. The common-law tort of abuse of process is "the use of legal process, whether criminal or civil, against another primarily to accomplish a purpose for which it was not designed." *Fuller v. Local Union No. 106,* 567 N.W.2d 419, 421 (Iowa 1997) (quoting *Palmer v. Tandem Mgmt. Servs., Inc.,* 505 N.W.2d 813, 817 (Iowa 1993)). The three elements of an abuse-of-process claim are: "(1) the use of a legal process (2) in an improper or unauthorized manner (3) that causes the plaintiff to suffer damages as a result of that abuse." *Gibson v. ITT Hartford Ins. Co.,* 621 N.W.2d 388, 398 (Iowa 2001); *accord Fuller,* 567 N.W.2d at 421–22. The tort of abuse of process is similar to that of malicious prosecution, in that both involve "improvident use of the courts." *Wilson v. Hayes,* 464 N.W.2d 250, 266 (Iowa 1990). The Iowa Supreme Court recognized the difference between the two torts as follows:

The focus . . . is slightly different:

> Malicious prosecution occurs when an action is instituted without foundation. Conversely, abuse of process may be found when [legal process] is . . . used to attain a collateral objective beyond that anticipated by the process. An ulterior motive does not alone satisfy the requirement for an action in abuse of process; a definite act or threat outside the process is required.

[Note, *A Lawyer's Duty to Reject Groundless Litigation*, 26 Wayne. L. Rev.] at 1555–56; *see also Grell v. Poulsen*, 389 N.W.2d 661, 663 (Iowa 1986).

*Wilson*, 464 N.W.2d at 266.

Iowa courts have not precisely defined "legal process" for purposes of this tort. *Fuller*, 567 N.W.2d at 422. In *Fuller*, the Iowa Supreme Court collected definitions from other authorities, noting:

> One authority defines the required "legal process" as "process which emanates from or rests upon court authority, and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act." 1 Am.Jur.2d *Abuse of Process* § 2, at 411 (1994). Another commentator states that "it is clear that the judicial process must in some manner be involved" in order to meet the first element. W. Page Keaton et al., *Prosser and Keaton on the Law of Torts* § 121, at 898 (5th ed.1984). This commentator also notes that the demand for collateral advantage may precede the issuance of process and still be actionable, "so long as process does in fact issue at the defendant's behest, and as a part of the attempted extortion." *Id.* The Massachusetts court of appeals has defined process as "the papers issued by a court to bring a party or property within its jurisdiction, e.g., a writ of attachment, the process used to initiate a civil action, or the process related to

the bringing of criminal charges." *Chemawa Country Golf, Inc. v. Wnuk*, 9 Mass.App.Ct. 506, 402 N.E.2d 1069, 1071 (1980).

*Fuller*, 567 N.W.2d at 422. The Iowa Supreme Court concluded that:

> We think the better view is that the mere report to police of possible criminal activity does not constitute legal process. One might criticize selfish or improper motives prompting a false or reckless report. Extreme cases can be imagined in which such a report might become actionable on another basis. But a report to the police is not sufficient to constitute "legal process" required for an abuse-of-process claim.

*Id.*

■ Lyons asserts that the decision in *Fuller* is distinguishable from the facts before the court in this case because a search warrant was obtained from a court and his property was subsequently searched pursuant to the warrant. Neither party has directed the court to any legal authority on the question of whether causing a criminal search warrant to be issued constitutes legal process and the court's own research has found no authorities specifically addressing the issue. However, a number of courts have discussed claims of abuse of process arising from the issuance of a search warrant and, while not specifically discussing whether causing a criminal search warrant to be issued constitutes legal process, have not dismissed a claim on that basis. *See U.S. Steel LLC v. Tieco, Inc.*, 261 F.3d 1275, 1291 (11th Cir.2001) (discussing allegations that defendants "abused the process of a criminal search warrant" by using "a criminal search warrant to gather information for a civil suit against the plaintiffs."); *Watson v. City of Kansas City, Kan.*, 185 F.Supp.2d 1191, 1208 (D.Kan.2001) (holding that plaintiffs stated claim of abuse of

process, under Kansas law, against defendant where it was alleged that city officials gave false and misleading testimony in support of search warrant); *Kaminske v. Wisconsin Cent. Ltd.*, 102 F.Supp.2d 1066 (E.D.Wis.2000) (denying summary judgment motion on claim of abuse of process arising from defendant's seeking search warrant); *1090 Jericho Corp. v. Elias*, 164 A.D.2d 852, 855, 559 N.Y.S.2d 358, 361 (2d Dept.1990) (affirming the denial of law enforcement officers' motion to dismiss abuse of process claim premised upon a search executed pursuant to a search warrant). Because the obtaining of a search warrant is a process which emanates from court authority and requires the owner of the situs of the search to permit a search of it, the court concludes that the obtaining of a search warrant constitutes "legal process" for the purposes of a claim of abuse of process. Therefore, this aspect of Midwest Glazing's motion for partial summary judgment is denied.

### 2. *Improper Purpose Requirement*

■ Eddy's Glass also argues that Lyons cannot establish the second element of his abuse of process claim. As this court has previously noted, "[t]he second element 'is difficult to establish.'" *Hanson v. Hancock County Mem'l Hosp.*, 938 F.Supp. 1419, 1448 (N.D.Iowa 1996) (quoting *Johnson v. Farm Bureau Mut. Ins. Co.*, 533 N.W.2d 203, 209 (Iowa 1995)). The second element requires proof that "the defendant used the legal process primarily for an impermissible or illegal motive." *Wilson*, 464 N.W.2d at 266 (emphasis in the original); *Johnson*, 533 N.W.2d at 209. The Iowa Supreme Court has taken a restrictive view of the primary purpose element, holding that:

abuse of process will not lie for a civil action which inconveniences a defendant, or for one filed in expectation of settlement (a "nuisance" suit). Additionally, there is no abuse of process when the action is filed to intimidate and embarrass the defendant knowing there is no entitlement to recover the full amount of damages sought.

All of this is true as long as the act that is alleged to be improper, is in fact proper in the regular prosecution of the proceeding. Put another way, the defendant is not liable if he has done no more than carry the process to its authorized conclusion, even with bad intentions.

*Wilson*, 464 N.W.2d at 267 (internal quotations and citations omitted); *Johnson*, 533 N.W.2d at 209. The Iowa Supreme had previously explained that:

To establish improper use of process, plaintiff must show "[s]ome act or threat directed to an immediate objective not legitimate in the use of the process." *Schmidt*, 340 N.W.2d at 284 (quoting Restatement (Second) of Torts § 682 app. (1981)). For example, the use of criminal process to coerce or extort an individual to pay a debt or to take some action or refrain from taking it is an abuse of process. *Id.* However, if an individual does no more than initiate and prosecute a criminal or civil action to its authorized conclusion, no abuse of process can be shown, regardless of the individual's malicious intent in doing so. *Grell*, 389 N.W.2d at 663–64; *Schmidt*, 340 N.W.2d at 284; *Froning & Deppe, Inc. v. South Story Bank and Trust Co.*, 327 N.W.2d 214, 215 (Iowa 1982).

At bottom, as we stated in *Grell:* "An[y] act which is proper in the regular prosecution of a proceeding cannot be relied upon as a basis for an abuse of process claim." 389 N.W.2d at 664. Rather, to show abuse of process, plaintiff must show defendants took some "specific action in connection with their use of process which can be characterized as unlawful or irregular." *Id.* In

other words, plaintiff must show defendants "committed some act in the use of process that was not proper in the regular prosecution of the proceeding." *Id. Tomash v. John Deere Indus. Equip. Co.,* 399 N.W.2d 387, 390–91 (Iowa 1987).

Lyons asserts that a jury could find that the primary purpose behind Eddy's Glass's reports of theft made after his termination was to prevent him from obtaining a Raynor distributorship or to keep him from competing with Eddy's Glass in the Forest City area. However, as Midwest Glazing cogently points out in its moving papers, while Lyons asserted in his deposition that he believed that Eddy's Glass learned that he was going to receive a distributorship from Raynor "a week or two" before the search, Midwest Glazing had first approached the police in mid-January of 2001, over a full month before the search on February 26, 2001. Thus, Midwest Glazing initiated the criminal investigation before learning that Lyons was going to be awarded a distributorship. While Lyons asserts in his brief that Midwest Glazing knew he had looked into obtaining Raynor distributorship at some point prior to his termination, he can point to no record evidence that anyone at Midwest Glazing or Eddy's Glass knew of his post-Eddy's Glass employment actions to obtain a distributorship from Raynor. Moreover, the circumstances are highly suggestive that Midwest Glazing had a good faith belief for initiating the investigation. Lyons admits that after his termination he returned to Eddy's Glass and took an assortment of display panels from the showroom floor. Lyons further admitted to Assistant Chief Davis that he had the display panels at his new office. He also admits that he showed Cronkwright several samples of overhead door windows that he had obtained from Raynor. Lyons also concedes that he received a garage door opener from Midland Door company while he was a representative of Eddy's

Glass and that he later installed the opener at his home. Midwest Glazing contacted the police and its employees provided written statements to Assistant Chief Davis. Davis in turn investigated Midwest Glazing allegations and later obtained a search warrant for Lyons's home. The investigation was ended when Davis determined that ownership of the property could not be proven definitively one way or the other. The record thus demonstrates that Midwest Glazing, by initiating the police investigation, has done no more than carry the process to its authorized conclusion. It is important to note that Lyons does not direct the court's attention to anything in the record which would demonstrate that the statements that Midwest Glazing's employees provided to Assistant Chief Davis were intentionally false. Thus, no abuse of process can be shown. *See Wilson,* 464 N.W.2d at 267; see also *Johnson,* 533 N.W.2d at 209; *Tomash,* 399 N.W.2d at 390–91. Therefore, Midwest Glazing is entitled to summary judgment on Lyons's abuse of process claim.

### C. Defamation Claims

■ As this court has explained in a number of decisions, defamation under Iowa law consists of the "twin torts" of "libel"—defined as malicious publication, expressed either in printing or in writing, or by signs and pictures, tending to injure the reputation of another person or to expose the person to public hatred, contempt, or ridicule, or to injure the person in the maintenance of the person's business—and "slander"—defined as oral publication of defamatory material. *See Hill v. Hamilton County. Public Hosp.,* 71 F.Supp.2d at 953; *King v. Sioux City Radiological Group, P.C.,* 985 F.Supp. 869, 877 (N.D.Iowa 1997); *Jenkins v. Wal-Mart Stores, Inc.,* 910 F.Supp. 1399, 1425–27 (N.D.Iowa 1995); *Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097, 1124–29 (N.D.Iowa

1994); *Thomas v. St. Luke's Health Sys., Inc.,* 869 F.Supp. 1413, 1441–45 (N.D.Iowa 1994), *aff'd,* 61 F.3d 908 (8th Cir.1995) (table op.); *O'Bryan v. KTIV Television,* 868 F.Supp. 1146, 1169–71 (N.D.Iowa 1994), *aff'd in pertinent part,* 64 F.3d 1188, 1195 (8th Cir.1995). Decisions of the Iowa Supreme Court are in accord with these definitions. *See Kennedy v. Zimmermann,* 601 N.W.2d 61, 64 (Iowa 1999); *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998); *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997). The parties agree that both "libel" and "slander" are at issue here. The alleged slanderous statements at issue here are the statements of Lyons's former co-workers Kevin Balvance and Steve Rochleau to Lyons's friend, Tom Larson, that: "it was the best thing that ever happened getting rid of [Lyons]"; Lyons did not do anything at the office and just sat around; and, Lyons was "lazy, good for nothing, didn't do anything around here." The alleged libelous statements concern the statements provided to Assistant Chief Davis.

■ In order to prevail on a defamation claim, a plaintiff must ordinarily prove that the statements were made with malice, were false, and caused damage. *Hill,* 71 F.Supp.2d at 953–54 (citing *Vinson v. Linn–Mar Community Sch. Dist.,* 360 N.W.2d 108, 115 (Iowa 1984), in turn citing *Vojak v. Jensen,* 161 N.W.2d 100, 104 (Iowa 1968)).

### 1. Slander Claim

■ Defendant Midwest Glazing asserts that plaintiff Lyons's slander claim fails as a matter of law because the statements of his former co-workers cannot be attributed to Midwest Glazing. Midwest Glazing argues that Balvance and Rochleau were not acting within the scope of the their employment when they made the allegedly slanderous statements to Larson. Mid-

west Glazing therefore contends that it is not bound by their statements. Lyons in turn contends that both Balvance and Rochleau were acting within the scope of the their employment at the time they made the allegedly slanderous statements to Larson.

In *Godar v. Edwards,* 588 N.W.2d 701 (Iowa 1999), the Iowa Supreme Court reiterated the principles for respondeat superior liability under Iowa law:

The well established rule is that under the doctrine of respondeat superior, an employer is liable for the negligence of an employee committed while the employee is acting within the scope of his or her employment. *Jones v. Blair,* 387 N.W.2d 349, 355 (Iowa 1986); *Sandman v. Hagan,* 261 Iowa 560, 566, 154 N.W.2d 113, 117 (1967). Thus, "[a] claim of vicarious liability under the doctrine of respondeat superior rests on two elements: proof of an employer/employee relationship, and proof that the injury occurred within the scope of that employment." *Biddle v. Sartori Memorial Hosp.,* 518 N.W.2d 795, 797 (Iowa 1994); *see also Vlotho v. Hardin County,* 509 N.W.2d 350, 354 (Iowa 1993).

We have said that for an act to be within the scope of employment the conduct complained of "must be of the same general nature as that authorized or incidental to the conduct authorized." *Sandman,* 261 Iowa at 567, 154 N.W.2d at 117. Thus, an act is deemed to be within the scope of one's employment "where such act is necessary to accomplish the purpose of the employment and is intended for such purpose." *Id.* at 566–67, 154 N.W.2d at 117. The question, therefore, is whether the employee's conduct "is so unlike that authorized that it is 'substantially different'." *Id.* at 567, 154 N.W.2d at 117. Said another way, "a deviation from the employer's

business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability." *Id.* at 568, 154 N.W.2d at 118.

Section 229(2) of the Restatement (Second) of Agency (1957) lists the following factors to be considered in determining whether conduct of an employee may be characterized as occurring within the scope of the employee's employment:

(a) whether or not the act is one commonly done by such servants;

(b) the time, place and purpose of the act;

(c) the previous relations between the master and the servant;

(d) the extent to which the business of the master is apportioned between different servants;

(e) whether or not the act is outside the enterprise of the master or, if within the enterprise, has not been entrusted to any servant;

(f) whether or not the master has reason to expect that such an act will be done;

(g) the similarity in quality of the act done to the act authorized;

(h) whether or not the instrumentality by which the harm is done has been furnished by the master to the servant;

(i) the extent of departure from the normal method of accomplishing an authorized result; and

(j) whether or not the act is seriously criminal.

Comment a, concerning subsection (2), explains that the ultimate question in determining whether an employee's conduct falls within the scope of employment is

whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed. Restatement (Second) of Agency § 229 cmt. a.

"Although the question of whether an act is within the scope of employment is ordinarily a jury question, depending on the surrounding facts and circumstances, the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court." *Sandman,* 261 Iowa at 569, 154 N.W.2d at 118 (deciding that question whether employee was acting within scope of employment was properly a question for the court, not jury); *cf. Mary KK v. Jack LL,* 203 A.D.2d 840, 611 N.Y.S.2d 347, 348 (N.Y.App.Div. 1994) (noting that "scope of employment" is usually a jury question, but summary judgment is appropriate where there is no conflicting evidence or the facts are undisputed).

*Godar,* 588 N.W.2d at 705–06; *accord Riniker v. Wilson,* 623 N.W.2d 220, 231 (Iowa Ct.App.2000).

The court concludes that the alleged statements by Balvance and Rochleau were not acts committed within the scope of their employment for which Midwest Glazing may be held liable. Balvance and Rochleau were employed by Eddy's Glass as glaziers and installers of overhead door. Neither Balvance nor Rochleau had any authorized job duties regarding public relations, or making statements on behalf of Eddy's Glass or Midwest Glazing, or evaluating the performance of co-workers. The court concludes that Balvance and Rochleau's actions were a substantial deviation from their duties at Eddy's Glass and were not "necessary to accomplish the purpose of employment." While Balvance and Rochleau's statements were made while working for Eddy's Glass, the court cannot

conclude these statements were committed in furtherance of their duties as glaziers and overhead door installers or the objectives of Eddy's Glass. *See Godar,* 588 N.W.2d at 707. Therefore, Midwest Glazing's motion for partial summary judgment is granted as to Lyons's slander claim.

### 2. Qualified Privilege Immunity To Libel Claim

▪ Defendant Midwest Glazing further contends that plaintiff Lyons's libel claim fails as a matter of law because of qualified privilege. Lyons responds that the qualified privilege is not applicable here because the statements were made without substantial basis and were made without a substantial investigation. "Qualified privilege provides immunity [to defamation claims] in some but not all instances." *Taggart v. Drake Univ.,* 549 N.W.2d 796, 803 (Iowa 1996). This court has explained the reason for, and elements of, qualified privilege as follows:

> [T]he law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability. *Id.* (citing *Vojak,* 161 N.W.2d at 104); *Higgins v. Gordon Jewelry Corp.,* 433 N.W.2d 306, 308 (Iowa Ct. App.1988). The elements of a qualified privilege defense are that (1) the statements were made in good faith; (2) the defendant had an interest to be upheld; (3) the statements were limited in their scope to this purpose; (4) the statements were made on a proper occasion; and (5) publication was in a proper manner and to proper parties only. *Knudsen v. Chicago & North Western Transp. Co.,* 464 N.W.2d 439 (Iowa 1990) (citing *Brown v. First Nat'l Bank of Mason City,* 193 N.W.2d 547, 552 (Iowa 1972)).

*Hill,* 71 F.Supp.2d at 953–54; *accord Taggart,* 549 N.W.2d at 803 ("Qualified privilege attaches to communications made (1) in good faith, (2) concerning a subject matter in which the speaker has an interest, right, duty, or obligation, and (3) to a listener who has a corresponding interest, right, duty, or obligation in the subject matter of the communication."). The court will consider each of these requirements *seriatim.*

#### a. Good faith

▪ Lyons argues that the qualified privilege is inapplicable here because the statements were made with actual malice. The qualified privilege is lost if the statements are not made in good faith, *Lara v. Thomas,* 512 N.W.2d 777, 786 (Iowa 1994); *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 104 (Iowa 1985), or made with actual malice. *Knudsen v. Chicago & North Western Transp. Co.,* 464 N.W.2d 439, 443 (Iowa 1990); *Vinson,* 360 N.W.2d at 116. Actual malice in this context "depend[s] on the motive for the statement. Actual malice requires proof that the statement was made with malice in fact, ill-will or wrongful motive." *Haldeman,* 376 N.W.2d at 103–04 (citing *Vinson,* 360 N.W.2d at 117); *Benishek v. Cody,* 441 N.W.2d 399, 403 (Iowa Ct.App. 1989). In the absence of actual malice, the qualified privilege extends even to statements that are untrue. *Vojak,* 161 N.W.2d at 105; *Benishek,* 441 N.W.2d at 402.

Here, the undisputed facts reveal that Eddy's Glass's employees communicated the alleged slanderous statements in good faith. Weide states in her statement that Lyons took a number of display samples off the showroom floor. Lyons, however, concedes that he returned to Eddy's Glass after his termination and took a number of display samples. Moreover, Lyons conceded in his deposition that he has no evidence that would suggest that Weide

did not believe the contents of her statement. Driscoll merely reiterated what he was told by Weide, the manager of Eddy's Glass. In his deposition, Lyons admits that he has no information that suggests that Cronkwright knowingly provided false information in his statement to the police. To the extent Lyons attempts to defeat Midwest Glazing's qualified privilege defense by arguing that the communications regarding Lyons's alleged actions were made with actual malice, the argument is rejected. Although Lyons complains that Eddy's Glass's investigation was flawed, he has failed to identify any evidence in the summary judgment record that Eddy's Glass's investigation was made with "malice in fact, ill-will or wrongful motive." *See Haldeman,* 376 N.W.2d at 104. Lyons suggests that evidence of malice lies in the fact that the statements were made after he expressed interest in obtaining a Raynor distributorship. However, as noted above, while Lyons contends that he believed that Eddy's Glass learned that he was going to receive a distributorship from Raynor "a week or two" before the search, Midwest Glazing had first approached the police in mid-January of 2001, over a full month before the search on February 26, 2001. This demonstrates that Midwest Glazing initiated the criminal investigation before learning that Lyons was going to be awarded a distributorship. Although Lyons contends that Midwest Glazing knew he had looked into obtaining a Raynor distributorship at some point prior to his termination, there is no record evidence that anyone at Midwest Glazing or Eddy's Glass knew of his post-Eddy's Glass employment efforts to obtain a distributorship from Raynor. The court concludes that Lyons has failed to establish a genuine issue of material fact that the statements were made with actual malice.

#### b. Interest to be upheld

The court also concludes that the second element of qualified privilege, that the party making the statement had an interest to be upheld, is also met here. Eddy's Glass, as a business, has an interest in protecting its property and investigating whether items have been taken from its business.

#### c. Scope of statements

The court finds that the statements by Driscoll, Weide, and Cronkwright were all limited in scope to achieve the purpose of obtaining the return of property that Midwest Glazing. Therefore, the court concludes that the third element of qualified privilege has been satisfied here.

#### d. Proper occasion, manner and party

The fourth and fifth elements required for qualified privilege to apply is that the statements were made on a proper occasion, and that the publication was in a proper manner and made only to proper parties. Midwest Glazing has satisfied these two requirements here. The statements by Driscoll, Weide, and Cronkwright were all given to Assistant Chief Davis to assist in the investigation and were made only after Midwest Glazing learned that Lyons possibly had taken property belonging to Eddy's Glass from the business. Thus, because Midwest Glazing has met all five elements required for qualified privilege to apply here to the statements made by Driscoll, Weide, and Cronkwright, the court concludes that plaintiff Lyons's libel claim fails because of application of qualified privilege to those statements. Therefore, Midwest Glazing's motion for partial summary judgment is granted as to Lyons's libel claim.

### D. FMLA Claim

Midwest Glazing also seeks summary judgment on Lyons's FMLA claim on the

ground that Lyons is not an eligible employee under the FMLA. Lyons does not resist this portion of Midwest Glazing's motion. Therefore, Midwest Glazing's motion for partial summary judgment is granted as to Lyons's FMLA claim.

### E. Contract Damages

Midwest Glazing also seeks partial summary judgment with respect to the damages that are recoverable for the alleged breach of contract. Midwest Glazing contends that Lyons is not entitled to contract damages past the date he obtained his new employment and that he is not entitled to damages for emotional distress.

### 1. Emotional distress damages under contract claim

As to the present issue, there is no decision of the Iowa Supreme Court directly on point. Generally speaking, the general rule of damages in contract actions under Iowa law is that the aggrieved party may receive the benefit of his or her bargain, and that his or her recovery is limited to loss reasonably foreseeable at the time the contract was made. *R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 420 (Iowa 1983) (noting that there was clear distinction between contract and negligence theories of recovery in that damages not anticipated are recoverable in tort, while under contract " 'only such damages as were reasonably contemplated by the parties at the time of entering into the agreement are recoverable for a breach thereof.' ") (quoting 25 C.J.S. *Damages* § 80 at 888 (1966)); *Meyer v. Nottger*, 241 N.W.2d 911, 919 (Iowa 1976) (noting that "[i]t is hornbook law that damages resulting from breach of contract are recoverable only for those injuries that may reasonably be considered as arising naturally from the breach of contract itself, or as such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as the probable result of the breach."). Although recovery for emotional disturbance is ordinarily not allowed, an exception may be made if the nature of the breach is particularly likely to cause serious emotional disturbance. *See Clark–Peterson Co. v. Independent Ins. Assocs.*, 514 N.W.2d 912, 916 (Iowa 1994); *Bossuyt v. Osage Farmers Nat'l Bank*, 360 N.W.2d 769, 777 (Iowa 1985); *Meyer*, 241 N.W.2d at 920–21. The Restatement (Second) of Contracts, which the Iowa Supreme Court has looked to for direction, expresses a similar rule:

> Recovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result.

RESTATEMENT (SECOND) OF CONTRACTS § 353 (1981). The comment to this section expands upon this rule:

> Damages for emotional disturbance are not ordinarily allowed. Even if they are foreseeable, they are often particularly difficult to establish and measure. There are, however, two exceptional situations where such damages are recoverable. In the first, the disturbance accompanies a bodily injury. In such cases the action may nearly always be regarded as one in tort, although most jurisdictions do not require the plaintiff to specify the nature of the wrong on which his action is based and award damages without classifying the wrong. See Restatement, Second, Torts §§ 436, 905. In the second exceptional situation, the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result. Common examples are contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages

concerning death. Breach of such a contract is particularly likely to cause serious emotional disturbance. Breach of other types of contracts, resulting for example in sudden impoverishment or bankruptcy, may by chance cause even more severe emotional disturbance, but, if the contract is not one where this was a particularly likely risk, there is no recovery for such disturbance.

RESTATEMENT (SECOND) OF CONTRACTS § 353 cmt. a (1981).

The first exception, which permits recovery for emotional disturbance where the claim involves bodily injury, is not applicable here. Thus, the court must determine whether the contract here is the type that falls into the second exception, "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." RESTATEMENT (SECOND) OF CONTRACTS § 353.

■■■ Defendant Lyons points out that the business from which he was fired was started by his step father and one in which he had worked for over fifteen years. Thus, he argues that it was foreseeable that his termination from such employment likely could cause serious emotional disturbance. Midwest Glazing responds that the contract in question was an employment contract which permitted termination for cause and points out that Eddy's Glass had not been a family run business for three years when Lyons was fired. In this court's view, damages for emotional distress are not recoverable because the nature of the contract clearly does not indicate that such damages were within the contemplation or expectation of the parties. Parties to an employment contract primarily exchange services for salary and benefits. Although employees may attach great personal and emotional significance to their employment, employment contracts principally serve an economic

purpose. As the Michigan Supreme Court has noted:

An employment contract will indeed often have a personal element. Employment is an important aspect of most persons' lives, and the breach of an employment contract may result in emotional distress. The primary purpose in forming such contracts, however, is economic and not to secure the protection of personal interests. The psychic satisfaction of the employment is secondary.

*Valentine v. General American Credit, Inc.,* 420 Mich. 256, 362 N.W.2d 628, 631 (1985) (holding that employee could not recover damages for mental distress for breach of employment contract). The *Valentine* decision has been repeatedly reaffirmed by the Michigan appellate courts. *Cirner v. Tru–Valu Credit Union,* 171 Mich.App. 163, 171, 429 N.W.2d 820 (1988); *Brewster v. Martin Marietta Aluminum Sales, Inc.,* 145 Mich.App. 641, 667–68, 378 N.W.2d 558 (1985); *Cowdrey v. A.T. Transp.,* 141 Mich.App. 617, 621, 367 N.W.2d 433 (1985). Other state courts have reached the same conclusion. *See Gaglidari v. Denny's Restaurants,* 117 Wash.2d 426, 815 P.2d 1362, 1374 (Wash. 1991) (holding that employee may not seek emotional distress damages for breach of contract); *see also Nitzsche v. Stein, Inc.,* 797 F.Supp. 595, 600 (N.D.Ohio 1992) (emotional damages not available in a breach of employment contract and noting that it had found that only twice emotional distress damages were held to be recoverable in any breach of contract setting, and "both cases involved marriage, and in both cases ordinary contract remedies [were] inadequate"). The court concludes that contracts for employment differ materially from the contracts for marriage and burial services, where courts have historically deemed damages for emotional distress to be within the contemplation or expectation of the parties, and that the employment

contract in question between Eddy's Glass and Lyons was not one which would permit the recovery of emotional distress damages because the breach of the contract was not of such a nature that serious emotional disturbance was a particularly likely result. Therefore, the court grants this portion of defendant Midwest Glazing's partial motion for summary judgment.

### 2. Damages beyond the date of Lyons' new employment

Midwest Glazing contends that Lyons is not entitled to contract damages past the date he obtained his new employment because he currently earns more per year than in his job with Eddy's Glass. Lyons asserts that while he currently earns more money in his current position, he is required to work more hours per year to earn it and that he receives less vacation time with his current job. Lyons contends that he should be permitted to recover the value to him of his time and his vacation time. Lyons has directed the court's attention to no legal authority supporting such a proposition and the court's own research has not disclosed any.

In *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823 (Iowa 1998), the Iowa Supreme Court set forth the proper framework for analyzing damages available upon breach of a contract:

> Under Iowa law, when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as he or she would have occupied had the contract been performed. *Magnusson*, 560 N.W.2d at 27; *see also* Restatement (Second) of Contracts 344(a) (1979); 22 Am.Jur.2d Damages 43 (1988). This type of damages is sometimes referred to as the injured party's "expectation interest" or "benefit of the bargain" damages. *Magnusson*, 560 N.W.2d at 27 (citing 22 Am.Jur.2d Damages 45). Under this theory of

damages, the nonbreaching party's recovery "is limited to the loss he has actually suffered by reason of the breach; he is not entitled to be placed in a better position than he would have been in if the contract had not been broken." 22 Am. Jur.2d *Damages* 45 (1988) (emphasis added).

In determining the amount of damages, we must also be mindful that "the measure of damages recoverable for a breach of contract in each case must have relation to the nature and purpose of the contract itself, as viewed in connection with the character and extent of the injury." *Id.* § 44. In addition, courts must also consider the foreseeability of damages. In *Kuehl v. Freeman Bros. Agency, Inc.*, 521 N.W.2d 714, 718 (Iowa 1994), we stated: [D]amages based on breach of a contract must have been foreseeable or have been contemplated by the parties when the parties entered into the agreement.... Damages which a reasonable person would expect to follow from breach of a contract are direct and thus should be awarded.

*Id.* at 831.

As noted above, Lyons seeks to recover the value to him of his time which has been lost as a result of his current employment's more rigorous time demands. Plaintiff Lyons demonstrates in his supplemental appendix that he is currently earning less per hour in his current position than he received while working for Eddy's Glass. While he now earns more in the aggregate, that is only because of the additional hours extended. When one considers only the pay received for the first forty hours of work done each week, plaintiff Lyons appears to have suffered an economic loss in that he is currently working for $3.27 per hour less. On the other hand, in his current position, Lyons is able

to earn $1816 more per year. The court notes that neither party has directed the court to any legal authority directly on point. In the absence of persuasive case law authority, the court is disinclined to grant this portion of Midwest Glazing's motion and will instead submit to the jury plaintiff Lyons's claimed loss from Midwest Glazing's alleged breach of the contract, including the present value to him of his time which has been lost as a result of his current employment's more rigorous time demands. It is true the amount of Lyons's damages cannot be computed to a certainty but the court concludes that the evidence affords a reasonable basis from which the amount may be approximated. Therefore, at this time, the court will deny this portion of defendant Midwest Glazing's partial motion for summary judgment without prejudice. Midwest Glazing is free to renew its request for summary judgment on this single issue by filing on or before January 7, 2003, a renewed motion for summary judgment along with persuasive legal authorities on this issue.

### F. Punitive Damages

Midwest Glazing also seeks summary judgment on Lyons' claim for punitive damages on his breach of contract claim. Lyons does not resist this portion of Midwest Glazing's motion. Therefore, Midwest Glazing's motion for partial summary judgment is granted as to Lyons's claim for punitive damages on his breach of contract claim.[2]

### III. CONCLUSION

The court initially concludes that the obtaining of a search warrant constitutes "legal process" for the purposes of a claim of abuse of process. The court further concludes that the uncontested facts of this case demonstrate that Midwest Glazing, by initiating the police investigation, has done no more than carry the process to its authorized conclusion. Thus, no abuse of process can be shown and Midwest Glazing's motion for partial summary judgment is granted as to Lyons's abuse of process claim. The court also concludes that the alleged statements by Balvance and Rochleau were not acts committed within the scope of their employment for which Midwest Glazing may be held liable. Therefore, Midwest Glazing's motion for partial summary judgment is granted as to Lyons's slander claim. The court further concludes that Lyons's libel claim fails because of application of qualified privilege to Midwest Glazing's statements. Lyons does not resist the portion of Midwest Glazing's motion related to its FMLA claim. Therefore, Midwest Glazing's motion for summary judgment is granted as to Lyons's FMLA claim. The court further concludes that the employment contract in question between Eddy's Glass and Lyons was not one which would permit the recovery of emotional distress damages because the breach of the contract was not of such a nature that serious emotional disturbance was a particularly likely result. Therefore, the court grants Midwest Glazing's partial motion for summary judgment with respect to Lyons's claim for damages for emotional distress related to his breach of contract claim. The court denies without prejudice Midwest Glazing's motion for partial summary judgment with respect to Lyons's claim for contract damages past the date he obtained his new employment. Finally, the court grants Midwest Glazing's motion for partial summary judgment with respect to

---

**2.** Midwest Glazing also seeks summary judgment on Lyons' claims for punitive damages relating to his other claims. However, because the court has granted summary judgment with respect to those claims, it is unnecessary for the court to consider Lyons' claims for punitive damages with respect to those claims.

Lyons's claim for punitive damages related to his contract claim.

IT IS SO ORDERED.